UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MATTHEW KONSPORE and LISA KONSPORE, | |
| *Plaintiffs*, | Civil No. 3:19cv161 (JBA) |
| *v.* | March 30, 2022 |
| UNITED STATES OF AMERICA | |
| *Defendant*. | |

**MEMORANDUM OF DECISION**

## I.    Introduction

This case claiming personal injuries and loss of consortium stemming from a car accident on June 2, 2017 in New Canaan, Connecticut was tried to a jury and the Court on October 13, 2021 through October 25, 2021 [Min. Entry Docs. ## 153-60]. It was brought against Sondra Peterson under Connecticut common law of negligence and the United States of America under the Federal Tort Claims Act ("FTCA") under various negligence theories related to the conduct of United States Postal Service ("USPS") employee Charles A. Curley. The jury found that Plaintiffs had failed to prove that Defendant Sondra Peterson breached any duty of care causing Mr. Konspore's injuries but, in its advisory capacity, found that Plaintiffs had proved that the United States was negligent. The jurors were unable to reach an advisory verdict on damages.

Pursuant to 28 U.S.C. § 2402, this case against the United States was triable to the Court. The following findings of fact and conclusions are based on the evidentiary record from the trial. They will be stated separately except where combined for readability. *See* Fed. R. Civ. P. 52(a)(1).

II.    **Findings of Fact**

On a clear and pleasant morning, Plaintiff Matthew Konspore, his son Trevor, and their acquaintances Cobie Jane and Hasaan, were walking along New Canaan's Park Street, chatting, with Trevor in the lead, then Mr. Konspore, then Cobie Jane and Hasaan. (Oct. 13, 2021 Tr. [Doc. # 153] at 142:20-21; Oct. 14, 2021 Tr. [Doc. # 154] at 183:1-6.) Mr. Konspore testified that he saw a USPS mail truck coming down Seminary Road, an intersecting street, and he simultaneously saw a Lexus SUV cresting the hill behind him on Park Street. (Oct. 13, 2021 Tr. at 143:11-12.) He saw the USPS mail truck fail to stop at the stop sign at the end of Seminary Road, driving into the intersection and "t-boning" the mid-rear section of Ms. Peterson's car, causing the car to spin towards the four pedestrians on the nearby sidewalk. (*Id.* at 56:1-8, 151:8-152:15.) Ms. Peterson's driver side front tire blew out when her car hit the curb, and although a portion of the front fender, bumper and hood hung over the sidewalk, the car never left the roadway nor struck any of the pedestrians. (*Id.* at 163:6-164:8.)

Trevor testified that all four pedestrians would have been hit had they not jumped out of the way of the car. (*Id.* at 110:21-111:5.) He pulled his father onto the dry landscaping mulch beside the sidewalk where Mr. Konspore initially landed on his left side, then "snapped over" onto his back. (*Id.* at 111:6-13, 112:8-14.) While Mr. Konspore initially said, "[p]lease don't touch me . . . call 911," Trevor helped his father off the ground to a standing position. (*Id.* at 113:5-9.)

None of the eyewitnesses who testified said they ever heard any car horns or brakes squealing. None of the pedestrians including Mr. Konspore reported any injury at the time a

police officer took his report shortly after the accident. (*See* Oct. 14, 2021 Tr. at 46:16-19, 191:25-192:6.) The USPS Station Manager who arrived on scene fifteen minutes later testified that no one seemed injured. (*Id.* at 167:23-25, 169:9-13.) Trevor and Mr. Konspore walked back to their car and drove home. (Oct. 13, 2021 Tr. at 114:20-115:20.)

## III.   Conclusions of Law

The FTCA gives district courts jurisdiction over suits brought against the United States for "the negligent acts of federal employees acting in the scope of their employment." *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020). It provides, in relevant part:

> the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). There is no dispute that this action was properly brought against the United States because Mr. Curley was acting in the scope of his employment as a Postal Service employee at the time of the accident. (*See* Joint Trial Mem., Stipulations of Fact. [Doc. # 74] at 5.) Further, because the car accident occurred in Connecticut, Mr. Konspore's claim is governed by Connecticut law. (*See id.* at 6); *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019).

### A.   Liability of the United States

Under Connecticut law, the "essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *Jagger v. Mohawk*

*Mountain Ski Area, Inc.,* 269 Conn. 672, 687 n.13 (2004). Mr. Curley testified that he stopped at the stop sign before turning left onto Park Street and that he saw the pedestrians but not the Lexus. (*See* Oct. 14, 2021 Tr. at 112:1-113:22.) His version of the events lacked credible force in light of the testimony of the pedestrian eyewitnesses and the findings of Postal Station Manager Inspector Angel Rodriguez that Mr. Curley failed to obey the stop sign and that his failure was a root cause of the accident. (*Id.* at 164:2-166:13.) A fair preponderance of the evidence proved that Mr. Curley ran through his stop sign and into Ms. Peterson's car, causing its resulting spinning towards the pedestrians and necessitating Mr. Konspore's need for evasive action. By running through the stop sign, Mr. Curley violated his duty to operate his vehicle with reasonable care which caused Mr. Konspore injury, and thus, like the advisory jury, the Court finds that Plaintiffs proved the United States negligent. *See* Conn. Gen. Stat. § 14-301(c) ("the driver of a vehicle shall stop in obedience to a stop sign at such clearly marked stop line or lines as may be established by the traffic authority having jurisdiction"); *Rawls v. Progressive Northern Ins. Co.*, 310 Conn. 768, 776 (2014) ("A defendant's duty and breach of duty is measured by a reasonable care standard, which is the care [that] a reasonably prudent person would use under the circumstances." (internal citations and quotations omitted)).

### B. Mr. Konspore's Damages

#### 1. Causation

At the time of the accident on June 2, 2017, Mr. Konspore had a significant history of cervical spinal problems and deterioration. He had undergone four surgeries by four doctors attempting to alleviate his pain symptoms, which included radiating arm pain, neck pain,

occipital region headaches, sharp jolts, burning, and numbness. (*See* Exs. 507-512.) He claimed that on the day of the accident, his sudden evasive action worsened his symptoms and necessitated two additional cervical surgeries two and a half years later. The critical and vigorously disputed issue presented during trial was whether Mr. Konspore proved that his worsened cervical spine condition and two additional surgeries were caused by Mr. Curley's negligence or whether this accident caused only temporary impairment akin to a whiplash injury.

In order to recover damages, a plaintiff must prove that the injury complained of was caused by the defendant's negligence. Legal causation has two elements: causation in fact and proximate cause. *Winn v. Posades*, 281 Conn. 50, 59 (2007). Where an injury would not have occurred without the defendant's conduct, it is the cause in fact, and where the defendant's action is a "substantial factor in bringing about the plaintiff's injuries" it is the proximate cause. *Id.* at 56. Proximate cause requires a plaintiff to demonstrate "an unbroken sequence of events that tied [the plaintiff's] injuries to the [defendant's conduct]." *Rawls*, 310 Conn. at 777 (quoting *Winn*, 281 Conn. at 56). "A plaintiff must remove the issue[] of . . . proximate cause from the field of conjecture and speculation." *Winn*, 281 Conn. at 57.

At trial, Mr. Konspore's lengthy medical history was evaluated to examine whether trauma from his June 2 fall worsened his pre-existing cervical spine condition or caused any permanent injury to his spine. Mr. Konspore's cervical spine problems began in 2008 after he was involved in a motor vehicle accident which necessitated two shoulder surgeries. (Ex. 501 at 1.) His condition worsened in 2013 when he was diagnosed with chronic cervical disc disease, (*id.* at 5), deteriorating to the point that he was deemed fully disabled from

employment in 2014. (*See* Oct. 14, 2021 Tr. at 50:25-51:2.)

Mr. Konspore had undergone four cervical operations before the June 2 accident, the last of which was less than two months before the accident. (Ex. 514.) In September 2014, Mr. Konspore's C5-6 and C6-7 cervical levels were fused, (Ex. 502 at 5), but afterwards, he remained in pain and underwent a second surgery on the same cervical areas in March 2015, (Ex. 505). The C5-T1 levels were fused in a third surgery in July 2016. (Exs. 508, 510.) His fourth surgery in April 2017 had a corrective purpose because surgical screws had pulled loose. (Ex. 515.)

In his April 2017 post-surgery follow-up appointment, his surgeon Dr. Daniel Riew reflected in his medical report that Mr. Konspore was still having headaches over his left temple region, but expected that all his symptoms would subside as the bone healed over the next two to three months. (*Id.*) He was permitted to start physical therapy with upper extremity strengthening exercises but no neck manipulation. (*Id.*) Dr. Riew anticipated that at four-and-a-half months post-surgery, he would be close to "being fused." (*Id.*)

On May 31, 2017, three days before accident, Mr. Konspore reported to his physical therapist that "[h]e ha[d] persistent pain down [his] bilateral arm lateral shoulder, brachioradialis[1] to digits 1-5 . . . radiat[ing] to head . . . and along left CT paraspinals." (Ex. 516.) He described his pain as "constant" like "pins/needles/tingling/burning," which his physical therapist characterized as "borderline allodynia."[2] (*Id.*)

---

1  The brachioradialis is an arm muscle which helps to bend the arm and elbow. *Brachioradialis*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/brachioradialis.

2  Allodynia is pain due to a stimulus that does not normally provoke pain. (*See* Oct. 18,

In the hours after the accident on June 2, 2017, Mr. Konspore emailed Dr. Riew's assistant, reporting that he was "indirectly involved" in a motor vehicle accident and was experiencing "tighten[ing]" and "extreme pain" in his neck with "extreme nerve pain." (Ex. Z.) Three days after the accident, Mr. Konspore spoke with Dr. Riew's office and reported "excruciating pain and swelling." (Ex. 517.) Dr. Riew directed Mr. Konspore to obtain an x-ray and prescribed him steroids "to help calm down the nerves and irritation," but concluded that it was "highly unlikely that the event did anything to the existing instrumentation." (*Id.*) The following day, Mr. Konspore sent his x-ray to Dr. Riew and requested a stronger prescription because his left arm "tingl[ed] like crazy." (*Id.*) Dr. Riew prescribed tramadol for his pain but stated in his email to Mr. Konspore that the "x-rays looked great; no CT scan needed at this point." (*Id.*)

After continued reports of pain, (Ex. L3 (7/5/2017)), Dr. Riew ordered a CT scan of Mr. Konspore's cervical spine which was conducted on July 7, 2017. (Ex. 519.) The radiologist, Dr. Richard Culver, compared this scan with pre-accident imagining—a January 2017 CT scan and an MRI taken in March 2017—and concluded that the C2-3 and C3-4 levels were "[u]nremarkable"; the C4-5, C5-6, C6-7 levels had "no change"; and the C7-T1 level was "without change." (*Id.*) While unchanged, the C4-5 level reflected "stable trace degenerative retrolisthesis." (*Id.*)

At his July 11, 2017 follow-up appointment with Dr. Riew, Mr. Konspore described being involved "in a pedestrian versus car accident where he was the pedestrian, then had a whiplash kind of injury and needed to wear a collar and had increased pain." (Ex. 520.) Dr.

---

2021 Tr. at 91:20-24.)

Riew reviewed Mr. Konspore's diagnostic imaging, concluding that he had a "solid fusion" at the C5-C6, C6-7, and C7-T1 levels and that the C5 to T1 levels would "never bother him again as they are solidly fused and all the screws are in good position." (*Id.*)

Throughout this time, Mr. Konspore complained to his physical therapist of a burning sensation, reporting that his arms were "burning/numb" on June 14, 2017. (*See* Ex. L3.) On July 19, 2017, Mr. Konspore stated that his arms and neck were "burning 24/7." (*Id.*) The symptoms of burning continued, spreading from his arms to his legs in November and December. (*See id.*) He also testified to a burning sensation that he experienced after the accident. (*See* Oct. 13, 2021 Tr. at 167:1-168:21.)

In his December 14, 2017 and April 12, 2018 return appointments with Dr. Riew, Mr. Konspore continued to complain of neck pain radiating down to both hands. He received an MRI on December 14, 2017, which showed no significant neural compromise "with the possible exception that [he] has a Chiari malformation without a syrinx" which "he has had . . . all of his life." (Ex. 524.) The MRI also reflected "some mild retrolisthesis," "mild ligamentum flavum buckling," and mild bilateral foraminal narrowing at the C4-5 level.[3] (Ex. 524.) In April 2018, Mr. Konspore continued to complain of headaches and noted that while he did not "think that he was completely symptom free prior to [the June 2, 2017] accident, . . . he definitely notes the difference between before that accident and after that accident." (Ex. 525.) Dr. Riew concluded that the only level with pathology was at C4-5, which had "bilateral foraminal stenosis." (*Id.*) This, he concluded, would be the only level

---

3  During cross-examination, Dr. Riew testified that Mr. Konspore's pre-accident March 2017 MRI also showed retrolisthesis and ligamentum flavum buckling at the C4-5 level. (Oct. 15, 2021 Tr. at 121:8-10,122:6-13, 123:18-124:4.)

accounting for Mr. Konspore's arm pain but noted that there was no neurologic deficit associated with such an impingement. (*Id.*) Dr. Riew further believed the longstanding numbness Mr. Konspore was experiencing was due to his C6-7 and C7-T1 levels, areas where he had undergone prior surgeries, which would eventually recover as his nerves regenerated. (*Id.*)

Mr. Konspore's MRI showed a "minimally bulging disc" at C3-4 in his September 2018 office visit, although Dr. Riew remained unclear about the source of Mr. Konspore's on-going symptoms. (Ex. 528 ("I believe that there are several possible sources of his pain.").) On July 25, 2019, Dr. Riew theorized that Mr. Konspore's C4-5 level had "degenerated further." (Ex. 529.) In November 2019—more than two years after the accident—Dr. Riew was still uncertain what was causing Mr. Konspore's symptoms and ordered a new MRI which showed central foraminal stenosis bilaterally at C4-5 and C3-4, leading Dr Riew to believe that the C3-4 level was causing "a high cervical radiculopathy with pain going in the retroauricular region and the C4-5 level." (Ex. 531.)

Mr. Konspore underwent further surgery in January 2020 when his C3-4 and C4-5 levels were fused to provide stability and reduce inflammation. (Ex. 533 at 4; Oct. 15, 2021 Tr. [Doc. # 155] at 83:8-15.) This surgery failed to relieve Mr. Konspore's symptoms and resulted in "pseudoarthrosis," or a failed spinal fusion. (Ex. 533 at 7; Oct. 15, 2021 Tr. at 132:22-25.) Dr. Riew performed Mr. Konspore's sixth surgery in December 2020, fusing Mr. Konspore's spine from C2 to T2. (Ex. 534 at 2.) While improved, Mr. Konspore continued to experience some chronic symptoms. (Ex. 536.)

Nothing in Dr. Riew's records reflected any opinion about the cause of Mr. Konspore's

continued pain because doctors "don't worry about causation when [they are] treating patients." (Oct. 15, 2021 Tr. at 112:20-21.)[4]   Dr. Riew opined at trial that Mr. Konspore's fall caused his neck to become "sloppy" from "ligamentum flavum buckling, stretching, tearing" allowing retrolisthesis to further develop. (Oct. 15, 2021 Tr. at 81:17-82:7.) He testified that Mr. Konspore's "posterior longitudinal ligament could have been stretched and torn," or the fall could have caused "an annulus tear, et cetera," (*id.* at 82:7-9), opining that these conditions necessitated surgery in 2020 to decrease his inflammation and stabilize his cervical spine, (*id.* at 81:17-83:22). Dr. Riew acknowledged that his opinion on Mr. Konspore's injuries had shifted since his April 2020 deposition because he "hadn't examined all of the MRIs and so on prior to that deposition" and "now we're worried about causation." (*Id.* at 118:18-119:5.)

Dr. Riew's conclusion that Mr. Konspore's symptoms were caused by the trauma of the accident was based in substantial part on Mr. Konspore's post-accident symptoms which did not exist when he last saw him prior to the June 2 accident. (*Id.* at 157:1-7.) When asked for the cause of Mr. Konspore's increased pain, Dr. Riew responded, "[h]e fell and landed on his back and on his left side. It was clear that he wasn't having this kind of severity of symptoms beforehand. He got it afterwards." (Oct. 15, 2017 Tr. at 156:16-157:7.) On cross-examination, he confirmed that he was basing his causation opinion on the pain Mr. Konspore began experiencing after the accident, because "if you have new symptoms or

---

4  (*See also* Oct. 15, 2021 Tr. at 111:17-23 ("And so when you're looking at this MRI, I'm not thinking about, boy, I got to get down to the nitty-gritty of what happened and what caused his problem, because I'm just a treating doctor at that point. I'm not thinking about, you know, causation and figuring out is this due to this accident or this.").)

aggravation of your symptoms after some event and you can reasonably conclude that that event *could have* aggravated or caused those symptoms, then you don't have to be a doctor to say it's got to be related to one another." (*Id.* at 126:1-6 (emphasis added).)

Dr. Riew did not believe that Mr. Konspore's fall disrupted the fourth surgery which he had performed, (*id.* at 104:15-105:5), but opined that Mr. Konspore sustained a soft tissue injury to his neck, (*id.* at 143:18-24). While he stated that this soft tissue injury necessitated Mr. Konspore's January 2020 surgery, (*id.* at 81:17-83:22, 143:18-24), he did agree that a soft tissue injury and inflammation could be superimposed on a preexisting condition and subside over time, bringing the individual back to the symptoms of his or her preexisting condition. (*Id.* at 145:10-20.)

The Government's expert witness Dr. Benjamin Bjerke, a graduate of Columbia College of Physicians and Surgeons and a board certified orthopedic and spinal surgeon, testified on his opinion regarding a causal relationship between the June 2, 2017 accident and Mr. Konspore's worsening cervical spine condition. (*See* Oct. 19, 2021 Tr. [Doc. # 157] at 6:11-7:10.) Comparing the medical imaging and associated radiology reports of Mr. Konspore's cervical spine before and after the June 2, 2017 accident, Dr. Bjerke saw no significant changes to the cervical spine consistent with the trauma Mr. Konspore described, as opposed to continued spinal deterioration. (*Id.* at 24:21-25:4, 29:6-10, 31:23-32:9.) He observed no evidence of any significant soft tissue injury which would have caused Mr. Konspore to have developed "lasting pathology or damage" on his December 12, 2017 MRI, but agreed that Mr. Konspore could have suffered a soft tissue injury and inflammation which would not have caused him "lasting pathology or worsening of his cervical spine

11

condition." (*Id.* at 29:11-30:18.) He concluded, "[t]o a reasonable degree of certainty, I feel there is no relationship with respect to the incident on June 2, 2017, and subsequent worsening of Mr. Konspore's cervical spine or need for further surgery."[5]  (*Id.* at 47:12-16.)

There are several important areas in which Dr. Bjerke and Mr. Konspore's doctors agreed. Dr. Bjerke agreed with Dr. Richard Culver's radiology report from Mr. Konspore's July 7, 2017 CT scan, concluding that there was no significant change shown between Mr. Konspore's March 2017 MRI (pre-accident) and his July 2017 CT scan (post-accident). (*Id.* at 25:5-27:22 (quoting Ex. 519).) Both Dr. Riew and Dr. Bjerke agreed that there were no significant differences between Mr. Konspore's March 2017 MRI (pre-accident) and December 2017 MRI (post-accident). (*Id.* at 45:3-13 (quoting Ex. 525).) And both Dr. Riew and Dr. Bjerke agreed that Mr. Konspore's fall could have caused a soft-tissue injury and inflammation. (*Id.* at 30:8-18; Oct. 15, 2021 Tr. at 40:23-41:4.)

Dr. Bjerke offered a clear and internally consistent expert opinion on the relationship between the June 2 accident and Mr. Konspore's deteriorating cervical spine, which contrasted with Dr. Riew's shifting opinion testimony on the cause of Mr. Konspore's pain. In the Court's view, the opinion of Dr. Bjerke was the more probative and persuasive evidence on the cause and nature of Mr. Konspore's injury to a reasonable degree of medical certainty.

Further, while Dr. Riew maintained that the June 2 accident "obviously" caused Mr.

---

[5]  Plaintiff's counsel was strenuously critical of Dr. Bjerke's analysis because Dr. Bjerke had never physically examined Mr. Konspore. (*See, e.g.*, *id.* at 50:25-51:5.) While physical contact with a patient is "one component of a complete physical evaluation," (*id.* at 64:24-65:7), there was no evidence that an absence of physical examination undermined Dr. Bjerke's analysis of Mr. Konspore's radiological results.

Konspore's subsequent cervical symptomatology, (Oct. 15, 2017 Tr. at 156:16-157:7), his reliance only on the temporal change in Mr. Konspore's symptoms is insufficient proof that the accident was a substantial factor in causing Mr. Konspore's condition and need for his fifth and sixth surgeries. When evaluating causation, a "trier is not concerned with possibilities but with reasonable probabilities," *Aspiazu v. Orgera*, 205 Conn. 623, 630 (1987), and Dr. Riew's testimony relied upon possibilities and conjecture. He testified that Mr. Konspore's lasting pain was caused by inflammation, ligamentum flavum buckling, stretching, and tearing which worsened his retrolisthesis at the C3-4 and C4-5 levels. (Oct. 15, 2017 Tr. at 81:17-82:22.) However, trace retrolisthesis already had been seen at the C3-4 and C4-5 levels and ligamentum flavum buckling at the C4-5 level in Mr. Konspore's pre-accident MRI in March 2017. (Oct. 19, 2017 Tr. at 16:18-20.) While Dr. Riew testified that the fall could have stretched Mr. Konspore's ligaments and accelerated the deterioration his spine, (*see* Oct. 15, 2017 Tr. 73:13-74:6), Dr. Bjerke explained that any soft tissue injury which would have caused lasting pathology, such as "[s]ignificant and severe soft tissue injuries to the ligaments or discs," would have been reflected on Mr. Konspore's December 2017 MRI and no such injury was present. (Oct. 19, 2017 Tr. at 29:12-30:7.) The Court concludes that Mr. Konspore has failed to prove by a preponderance of the evidence that his fall on June 2, 2017 caused or accelerated his retrolisthesis requiring his fifth and sixth operations, nor has he proved his continuing cervical deterioration and need for subsequent surgeries would not have occurred absent the negligence of the United States.

The Court does find, however, that Plaintiffs proved that the accident likely caused Mr. Konspore to experience a "whiplash" type soft tissue injury with concomitant

inflammation, (Oct. 15, 2021 Tr. at 143:23; Ex. 520; Ex. L3), perhaps resulting from his neck "jerk[ing] back and forth" during his fall, (*see* Oct. 15, 2017 Tr. at 23-25), which would not have occurred without the motor vehicle collision caused by Mr. Curley's failure to stop at a stop sign, causing Ms. Peterson's car to spin towards the sidewalk, and forcing Mr. Konspore to suddenly move out of its path. There is a sufficient causal link shown between these three events to conclude that Mr. Curley's failure to stop at the stop sign was a "substantial factor" in bringing about Mr. Konspore's whiplash. *See Winn*, 281 Conn. at 56. Satisfied that Mr. Curley's failure to stop at the stop sign on Seminary Road was the cause in fact and proximate cause of Mr. Konspore's "whiplash" type soft tissue injury, his damages are limited to this injury.

Neither Dr. Riew nor Dr. Bjerke testified as to how long Mr. Konspore would have likely experienced symptoms from such a soft tissue injury. Dr. Bjerke testified that "whiplash" is an injury to the soft tissue of the neck, (Oct. 19, 2021 Tr. at 85:12-13), and Dr. Riew observed that "burning" was consistent "with the type of inflammation that would be associated with the whipping of his neck during the June 2nd fall." (Oct. 15, 2017 Tr. at 62:2-7; 143:23.) While Mr. Konspore had complained of a type of burning sensation occasionally before the accident,[6] he testified to an intense burning sensation in the months after the accident and a continual and concentrated complaint of burning is reflected in his medical records for these months.[7] (*See supra* p. 7; Ex. L3.) By the end of December 2017, Mr.

---

[6] (*See* Ex. 510 at 6 (report that Mr. Konspore's "right arm is on fire" on September 26, 2016); Ex. 512 (complaint of "severe neck pain with burning in his arms" on March 7, 2017); Ex. L3 (description of "pins/needles/tingles/burning" on May 31, 2017).)

[7] (*See* Oct. 15, 2017 Tr. at 167:18-23 ("Q. Tell us how you felt in June, July, August, and what

Konspore's complaints of burning ceased.[8]  The Court finds that the consequences of Mr. Konspore's whiplash injury characterized by the "burning" likely continued from June 2, 2017 through December 2017.

### 2. Economic Damages

Mr. Konspore seeks reimbursement for his medical expenses, including his physical therapy with Peter Phillip and sessions with his mental health therapist, Maud Purcell, both of whom were treating Mr. Konspore before June 2. (*See* Exs. B4, O3, P4.) To recover damages, "the plaintiff must establish a causal relationship between the defendant's conduct and the plaintiff's alleged injuries." *Reeves v. United States*., No. Civ. 3:97-cv-1198 (HBF), 2000 WL 33200258, at *6 (D. Conn. Dec. 19, 2000).

Mr. Konspore offered hospital bills for the period beyond his whiplash symptomatology and no damages will be awarded for these expenses. (*See* Exs. B4 (bills from April 12, 2018-January 24, 2020), O3 (consolidated statement of benefits from July 5, 2019-

---

kind of complaints were you making to Dr. Philip during that time frame of the rest of the summer. A. I was complaining about the pain. I was complaining about the burning. . . ."); Ex. L3 (6/14/2017 "arms are burning/numb); (6/19/2017 "the burning in my hands is awful"); (7/19/2017 "[t]he arms and neck are burning 24/7"); (8/14/2017 "[t]he arms still burn"); (11/1/2017 "[t]he burning down my arms is unbelievable"); (11/6/2017 "I've been burning/aching all weekend. The fire in the arms is awful"); (11/10/2017 "[b]urning all over"); (11/13/2017 "I'm burning all over"); (11/15/2017 "[t]he burning is awful"); (11/17/2017 "[t]he burning in the arms and legs is bad") (12/13/2017 "the body is on fire").)

[8]  (*See* Ex. L3 (1/3/2018 complaint of headache; 1/10/2018 report of "agony"); Ex. 525 ("At the present time [April 18, 2018], [Mr. Konspore] has headaches that are in the occipital region, temporal and go retroorbital and has radiating pain down both upper extremities and it radiates down to the shoulder and it goes all the way down to the fingers bilaterally."); Ex. 528 (complaint of radiating pain, interscapular pain, and headaches on September 20, 2018).)

August 18, 2021), P4 (statement of professional services from December 09, 2020-September 14, 2021).)

However, Mr. Konspore did offer bills from Peter Phillip and Maud Purcell for treatment during the period of his soft tissue injury. He expended $10,430 on his physical therapy sessions between June 5, 2017 and December 29, 2017, and $1,875 on his psychological therapy sessions between June 8, 2017 and December 28, 2017. (*See* Ex. B4.) While Dr. Riew instructed Mr. Konspore to attend physical therapy after his fourth operation in May 2017,[9] his physical therapy records reflect that Mr. Konspore was offered manual therapy, soft tissue mobilization, and therapeutic exercises to try and relieve his painful symptoms. His pain was caused in part by the inflammation from his whiplash injury. (*See* Ex. L3.) Further, while Dr. Riew initially prescribed physical therapy for only six to eight weeks, (Ex. 515), Mr. Konspore sought physical therapy for several months.[10]   (*See* L3.) Because there is a demonstrated relationship between his whiplash injury and need for physical therapy to relieve his pain symptoms, the Court will award $10,430 in damages for these physical therapy sessions.

The Court will also compensate Mr. Konspore for his sessions with Maud Purcell. Mr.

---

[9]  (Ex. 515 (Dr. Riew's medical record advising that Mr. Konspore can "start physical therapy but they should not manipulate his neck."); Oct. 13, 2021 Tr. at 137:4-19 ("Q. And did Dr. Riew say to you that you could do anything with respect to physical therapy [on May 23, 2017]? Did he give you a script for P[hysical] T[herapy]? A. Yes. I was able to start physical therapy but to keep it -- to minimal.").)

[10]  His records reflect that he sought physical therapy between May 31, 2017 and January 10, 2018, but reflect no treatment between January 11, 2018 and May 18, 2020. (*See* Ex. L3.)

Konspore had treated with Ms. Purcell for his persistent depressive disorder before the accident, (Oct. 19, 2017 Tr. at 124:18-125:7), but he testified to the anguish and depression that the accident caused him, (Oct. 13, 2021 Tr. at 168:24). His therapist testified to the symptoms Mr. Konspore reported to her after the accident,[11]  (Oct. 19, 2017 Tr. at 127:16-130:10), including his fear of leaving his house or walking on sidewalks, (*id.* at 129:21-130:3), and intrusive memories, nightmares, and flashbacks of the accident, (*id.* at 148:20-149:7). As there is a causal link between the June 2, 2017 accident and Mr. Konspore's need for additional psychological therapy, Mr. Konspore will be compensated for the amount he expended on his therapy sessions with Ms. Purcell during the pendency of his soft tissue injury—$1,875.

Mr. Konspore also claims lost earnings. While on full medical disability since 2014, (*see* Oct. 14, 2021 Tr. [Doc. # 154] at 50:25-51:2), Mr. Konspore met with his former supervisor at Northwestern Mutual on May 31, 2017 to discuss his desire to return to work in the late summer. (Oct. 13, 2021 Tr. at 137:4-19.) Mr. Konspore testified that in anticipation of his return, he arranged a new home office in his basement and went shopping for new suits. (*Id.* at 137:20-138:22.) His former boss, Philip Bender, testified as to Mr. Konspore's job performance before the accident and Mr. Konspore's occasional check-ins with him, including on May 31, 2017. (Oct. 15, 2017 Tr. at 168:2-176:12.) He did not testify that Mr. Konspore could return to his former position, nor did he provide a timeframe for any such

---

11  While Ms. Purcell testified that Mr. Konspore's symptoms were "characteristic of post-traumatic stress disorder," (Oct. 19, 2017 Tr. at 127:25-128:1), there was no evidence that Mr. Konspore had received such a diagnosis. (*See* Ex. 546 (forms signed by Ms. Purcell in support of Mr. Konspore's application for Social Security Disability in November 2017 listing his diagnosis as "dysthymia" without mention of post-traumatic stress disorder).

return. (*See generally id.*) While Mr. Konspore was buoyed by the prospect of returning to work, he did not prove that the negligence of the United States proximately caused his inability to begin working again where his prospects for returning to work were speculative. No entitlement to lost earnings has been proved.

### 3.  *Noneconomic Damages*

Noneconomic damages are "monies awarded as compensation for non-monetary losses and injuries which the plaintiff has suffered, or is reasonably likely to suffer in the future as a result of the defendant's negligence" such as "physical pain and suffering, mental and emotional pain and suffering, and loss or diminution of the ability to enjoy life's pleasures." (Joint Trial Mem., Stipulations of L. [Doc. # 74] at 8 (quoting 3.4-1 Damages Connecticut Civil Jury Instructions Committee).)

Mr. Konspore testified about the emotional impact of his accident. He discussed that after his fourth surgery, he felt like he "had a chance" and "finally had hope" for recovery, (Oct. 13, 2021 Tr. at 135:20, 137:2), but after the accident, he felt like he "didn't have a future." (*Id.* at 168:24.) The accident flared his depression and he questioned, "why me . . . what did [I do] wrong to deserve this." (*Id.* at 174:5-7.) His emotional condition was aggravated by his inability to "get up and go to work" and "do things around the house," and he described the resentment that this caused in his wife and terror it caused in his children. (*Id.* at 169:4-11, 185:16-18, 174:8-15.)

He also testified to the physical pain he experienced, including pain "radiating down [his] arms like a burning sensation, nerve pain, and headaches that were coming up through [his] head to the front temple," (*id.* at 166:17-20), and this complaint of constant pain is

reflected in his medical records.[12] He described how he woke up throughout the night in pain. (*Id.* at 203:10-24.) He and his therapist also testified to his period of suicidal ideation, (*id.* at 182:11-183:6; Oct. 19, 2019 Tr. at 131:19-132:10), where he said he did not "have the strength to fight anymore." (Oct. 13, 2021 Tr. at 182:23.)

It is clear from the testimony and other trial evidence that Mr. Konspore experienced serious distress in the aftermath of the June 2 accident. While the resulting fall was not proved to have caused or accelerated Mr. Konspore's cervical deterioration, the harm from the negligence of the United States transcends physical injury alone. Considering the nature and intensity of Mr. Konspore's mental suffering and physical pain for the several months attributable at least in part to his soft tissue inflammation, the Court awards $180,000 in compensatory damages.

### C.  Loss of Consortium

Lisa Konspore claims a loss of consortium, a derivative claim compensating "the loss of services, financial support, and the variety of intangible relations that exist between spouses living together in marriage." *Greci v. Parks,* 117 Conn. App. 658, 675 (2009) (quoting *Shegog v. Zabrecky,* 36 Conn. App. 737, 751 (1995)) (internal quotation mark omitted). Such "intangible" aspects of a relationship include "constellation of companionship, dependence, reliance, affection, sharing and aid which are legally recognizable, protected rights arising out of the civil contract of marriage." *Shegog*, 36 Conn.

---

[12] (*See e.g.*, Ex. L3 (9/27/2017 "I'm in agony"; 10/30/2017 "The pain I'm suffering with is unlike any human should suffer with"; 11/17/2017 "The burning in the arms and legs is bad. I think the accident at the post office really did me wrong. I've not shaken this feeling—like its in me—running in the arms/legs since"); *see also* Ex. Z; Exs. 517, 520.)

App. at 751 (quoting *Gurliacci v. Mayer,* 218 Conn. 531, 562 (1991)). Because of the nature of the action, damages cannot be precisely measured. *Id.*

At trial, Ms. Konspore described her stable, committed marriage to Mr. Konspore for twenty-six years during which their three children were born. (Oct. 18, 2021 Tr. at 101:5-104:617.) She testified that after the accident, her husband was difficult to live with due to his irritability, crankiness, and intolerance—attributes that were not present before the accident. (*Id.* at 124:21-125:14.) She had to help Mr. Konspore shower and use the bathroom after the accident, (*id.* at 123:13-17), and had to take on the primary responsibilities around the house, (*id.* at 124:24-125:14). She stopped accepting clients to her hair salon to provide this care for her husband. (*Id.* at 104:17-25, 123:18-124:12.) Ms. Konspore also identified a lack of physical intimacy after the accident, in part because she and Mr. Konspore slept in separate bedrooms because of his restlessness. (*Id.* at 125:15-126:17.) Mr. Konspore's therapist Maud Purcell, whom Ms. Konspore consulted to try to understand how she could help her husband, testified that Mr. Konspore took out his pain on the people closest to him—his wife and children. (Oct. 19, 2021 Tr. at 128:23-129:20, 149:16-150:8.) Ms. Konspore testified that she slowly returned to work in December 2017, when her relationship started to improve, (Oct. 18, 2021 Tr. at 124:7-9, 131:21-132:4, 135:1-9), which roughly coincided with the diminution and cessation of Mr. Konspore's tissue inflammation symptoms. The family resumed vacationing in 2018. (*Id.* at 135:10-19.)

Her testimony demonstrates a deprivation of the intangible relations of her spouse in the months after Mr. Konspore's injury. The Court finds that Ms. Konspore suffered a temporary loss of her previous companionship with Mr. Konspore and awards $20,000 in

20

damages to compensate her for this loss.

**IV.    Conclusion**

Based on the foregoing findings, judgment in the total amount of $212,305 will be entered in favor of Plaintiffs, comprised of economic damages of $12,305 and non-economic damages of $180,000 for Mr. Konspore and $20,000 in damages for Ms. Konspore. Judgment shall be entered by the Clerk in favor of Plaintiffs and against the United States accordingly.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut: March 30, 2022

21